CYNTHIA ANN MORALES,     )
)
)
)
)     **Case No. 3:08-0032**
)     **Judge Trauger**
     **Plaintiff,**     )
)
**v.**     )
)
**BELLSOUTH**     )
**TELECOMMUNICATIONS, INC.,**     )
)
     **Defendant.**     )

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 40), to which the plaintiff has responded (Docket No. 47), and the defendant has replied (Docket No. 58). For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

This is an employment dispute in which the plaintiff, Cynthia Ann Morales, contends that the defendant, BellSouth Telecommunications, Inc. (BST), discriminated against her on the basis of her disability, along with committing other common law and statutory violations. Plaintiff Morales was hired by BST on December 5, 2005 as a "Sales Representative" in the "Consumer" division.[1] Initially, Morales worked in BST's regular, or USA, Call Center. At the regular call

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 42 and 48) and related affidavits and exhibits. Although facts are drawn from

1

center, Morales was constantly on the phone, working directly with BST's customers needing assistance in utilizing BST's products, such as long-distance telephone service or the Internet.

After six, apparently uneventful, months in the Call Center, BST moved Morales to the "Web Center." Here, Morales also handled customer service issues, but, in addition to talking with BST's customers on the phone, she also interacted with BST's customers on-line, so she might simultaneously be talking to one BST customer about one issue on the phone while "chatting" with another BST customer on the computer. Even if Morales was only dealing with one customer at a time, in order to efficiently and properly access the customer's information, she needed to be able to talk and use the computer (including the keyboard) simultaneously. Employees such as Morales used a headset to talk on the phone, and, because of the length of the headset cord and the relatively low height of the standard BST desk at the Web Center, Morales did not find it possible to stand and effectively use the phone and computer. At her Web Center workstation, Morales had an office chair with a round back and arm rests. Her desk was stable.

Throughout her employment, Morales worked a typical Monday through Friday shift, with mandatory overtime, once or twice a month, on the weekends. In a typical week, Morales worked seven-and-one-half hours per day, along with an unpaid thirty-minute break for lunch. Morales was also entitled to two, paid fifteen-minute breaks, one in the morning and one in the afternoon.

Prior to working at BST, while she suffered from moderate and occasional back pain and

---

submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

soreness, Morales had held several jobs and had never had any medical issues that affected her ability to work. In December 2006, this back pain began to get worse, and Morales started to see physicians for treatment of her back pain, because the pain was affecting her day-to-day life and her ability to work. On January 9, 2007, Morales visited Dr. Stanley G. Hopp, a Board-certified orthopedic surgeon with the Tennessee Orthopedic Alliance. Dr. Hopp diagnosed Morales with "Lumbar syndrome with episodic left sciatica but no objective radiculopathy." Dr. Hopp wrote a prescription for Morales, which stated only "Ergonomic chair & desk at work."

With the goal of obtaining this "ergonomic" office equipment, Morales faxed a copy of Dr. Hopp's prescription to her supervisor, Brittany Bills, and she also handed Bills a copy of the prescription at work. Bills told Morales that "it shouldn't be a problem" to get her the ergonomic equipment, because "nobody ever gets declined for them especially if you have a doctor's note." Bills and Morales understood that, by an "ergonomic" desk and chair, Dr. Hopp was recommending that Morales have a "raised" desk and chair, which would allow Morales to alternate sitting and standing while on the phone and the computer. Indeed, Bills even picked out a new spot on the floor for Morales' new workstation because a raised desk would only fit in certain areas of the floor. BST Center Director Nicole Sauer estimated that the cost to make Morales' workstation "ergonomic," as Morales requested, would have been about $500 and the entire process, once the chair was delivered, would have taken less than one hour. (Docket No. 40 Ex. 7 at 43-45.)

At BST, whenever an employee requested an accommodation related to a physical impairment, BST submitted the request to a company called Concorde, and Concorde either approved or denied the request. At least eleven other BST employees at the plaintiff's work

location have requested and received a "raised desk" as an accommodation to deal with some sort of physical impairment. Generally speaking, in order to process the request, BST sent Concorde a medical release from the employee requesting the accommodation, and then Concorde would contact the employee's physician to verify the need for the accommodation.

Here, Bills faxed Morales's medical authorization and Hopp's prescription to Marta Ramirez, in BST's Miami office, as Ramirez was a liaison between BST and Concorde. These materials were then forwarded to Concorde. Concorde then forwarded a "Physician's Report" form to Hopp, which would allow Hopp to confirm that Morales had a condition that required an accommodation. When Hopp's office returned the Physician's Report form to Concorde, however, the notations on the form indicated that Morales was "able to work full duty" and that she had no "specific work restrictions." At his deposition, Hopp indicated that it was his assumption that all relevant parties understood that the notations in the Physician's Report were qualified by the previous recommendation for an ergonomic desk and chair. (Docket No. 40 Ex. 2 at 33-34.) Hopp also stated that the Physician's Report was filled out by his office staff, based on the information in the medical records. (*Id.* at 13-14.)

In late January 2007, after receiving the Physician's Report back from Hopp, Pamela Horn, a Concorde Nursing Director, completed a form regarding Morales that stated that the "medical documentation from doctor is insufficient and does not justify request for ergonomic work station," and Horn sent this form back to Edna Maultsby, who was also a liaison between BST and Corcorde.

During the late winter of 2007, Morales was rarely at work, taking Family and Medical Leave Act (FMLA) leave for much of the time, and she was also on short-term disability leave

4

from February 19 to March 19. (Docket No. 44 Ex. A.) Each employee was permitted 450 hours of FMLA leave over a twelve-month period, and time taken on short-term disability leave also counted as FMLA leave, although Morales did not know that at the time. Therefore, Morales, who kept close track of her FMLA leave, overestimated the number of hours of FMLA leave that she had left during this period.

Morales claims that all of this leave was necessary to deal with her back pain, which, in her deposition, she described as quite severe, particularly when she was forced to sit for an extended period of time. (Docket No. 40 Ex. 1 at 39-46.) While Morales frequently followed up with Bills on the status of her requested accommodation, it was not until Morales returned from short-term disability leave on March 19, 2007 that Bills informed Morales that Morales's request for an accommodation (now more than two months old) had not been granted, because the information provided to support the accommodation was insufficient. Bills apparently suggested that, if Morales provided more information, the request for an accommodation might be granted.

Very shortly thereafter, Morales brought Bills another copy of the prescription, notes from a visit to her physical therapist, physician's notes and an MRI report. It appears that these materials were never actually forwarded to Concorde; at this time, Bills was preparing to go on maternity leave, and she does not recall whether she sent the materials to Concorde prior to her departure, or if she left that matter for her replacement. (Docket No. 40 Ex. 3 at 41.) Either way, it does not appear that Concorde has a record of these additional materials. (Docket No. 43 Ex. A.)

From March 19 to April 23, 2007, Morales took eight days of FMLA leave, again, she claims, related to her back ailments. (Docket No. 44 Ex. A.) Otherwise, she was at work as

scheduled, although she continued to be in significant pain. As Morales put it, she needed to take some days off because "it was killing me still sitting in that desk." (Docket No. 40 Ex. 1 at 48.) On or about April 23, 2007, Morales sent an e-mail to her new supervisor (Bills' maternity leave replacement), asking if the supervisor had heard anything regarding her requested desk and chair, stating, as Morales put it at her deposition, "Look, this is really, really bothering me. I wouldn't be taking the time off if I had the desk and chair. Have you heard anything yet?" (*Id.* at 49.)

On April 25, the supervisor responded that the request had, again, been denied by Concorde for insufficient documentation. It remains unclear what the basis for that statement was; not only is there no record of Concorde's receiving the second batch of materials Morales gave to Bills, but there is also no written record of a second denial by Concorde.

On May 1, after taking FMLA leave for the previous two working days, Morales e-mailed her supervisors and stated that she would be "out of work due to illness until further notice," that is, until "this matter of an ergonomic work station (as prescribed by my doctors) [is] rectified." While advising Morales that her e-mail was not an acceptable way of reporting daily illness, Center Manager Nicole Sauer responded that she would "gladly inquire as to why the documentation you have turned in was not sufficient for approval."

In her inquiry, Sauer, in conjunction with Maultsby, apparently concluded that the plaintiff's request could be denied because all desks and chairs at BST's office were technically "ergonomic." (Docket No. 40 Ex. 7 at 103.) Sauer reported this conclusion to human resources manager Cecilia Welch, and they jointly concluded that they had "done due diligence" on the plaintiff's request, and that the plaintiff "does not have a valid excuse to be absent." (*Id.*)

6

Later that day, in an apparent response to a voice message left by Sauer, Morales wrote another e-mail to her supervisors in which she recounted, at considerable length, the steps she had taken to obtain her raised desk and the intense pain she was in on a daily basis at work because she had not received her accommodation. Morales stated, "since I have been back to work, I have been in a lot of pain having to sit at my current work station. I find myself taking very strong prescription pain medication by lunch time daily, and most times [I] have to take it again when I get home in the evening. If I do not take any ill time during the week, I also have painful weekends." (Docket No. 40 Ex. 7 at 100.) Morales concluded the e-mail stating, "I will have my doctor restate the request for the ergonomic work station and turn that in as soon as possible. Until then, I will continue to call in daily to report out as requested. Hopefully, my new work station will not take too long." (Docket No. 40 Ex. 7 at 100.) Morales never submitted supplemental material from Dr. Hopp to Sauer or anyone else at BST after this e-mail was sent. Morales continued to take FMLA leave throughout the month of May and into June. (Docket No. 44 Ex. A.)

After the plaintiff took several more weeks of FMLA leave related to her back, Sauer wrote Welch again, stating, regarding the plaintiff, that "[she] said she is not returning until she got [sic] a raised desk. ... When can I put her off payroll?" (Docket No. 40 Ex. 7 at 107.) To this e-mail, Welch, copying Maultsby, suggested drafting "a RTW [return to work] letter with the STD [short term disability] leave info." (*Id.*) Maultsby replied that she had already written such a letter. (*Id.*)

Indeed, Morales received a letter from Maultsby, dated May 16, 2007, which stated that Morales was not qualified for any short-term disability benefits, because there was no medical

information on file that supported a claim of total disability from work.  The letter provided

Morales with four options: (1) provide proof of disability to BST as specified in BST's benefit

plan; (2) take leave under the FMLA, if eligible; (3) apply for a leave of absence to appeal the

denial of short-term disability benefits; or (4) return to work by June 5, 2007.

As noted above, Morales continued to take FMLA leave through May and June, but,

because she had overestimated the amount of FMLA leave she had remaining, Morales was

unwittingly taking leave for which she was ineligible, as her FMLA leave allowance had been

exhausted as of May 21, 2007.  (Docket No. 44 Ex. A.)  Further, Morales did not submit

materials to support an actual claim of disability, apply for leave to appeal the denial of benefits,

or return to work.  On June 12, 2007, BST sent Morales a letter stating that, because she had not

selected a viable option stated in the May 16 letter, BST was presuming that Morales had

abandoned her position.  (Docket No. 40 Ex. 1 at 99.)  Since her termination, the plaintiff claims

to have been diagnosed with ankylosing spondylitis, which is a degenerative, arthritic back

condition, and she is currently receiving treatment from a rheumatologist.  (Docket No. 40 Ex. 1

at 70.)

On December 7, 2007, Morales filed this action in Davidson County Circuit Court, and

the defendant removed the case to this court.  (Docket No. 1.)  On April 24, 2008, the plaintiff

filed her Amended Complaint, asserting multiple statutory and common law claims.  Substantial

discovery has taken place, and the defendant has filed a motion for summary judgment.

## ANALYSIS

The plaintiff claims that the defendant, BST, violated the Americans with Disabilities Act

(ADA), 42 U.S.C. § 12101, *et seq.*, the Tennessee Disability Act (TDA), T.C.A. § 8-50-103 *et*

*seq.*, and the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* The plaintiff

also claims that BST's conduct created a hostile work environment.[2]

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if

"the pleadings, the discovery and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the

absence of a genuine issue of material fact as to an essential element of the opposing party's

claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d

558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the

factual evidence and draw all reasonable inferences in the light most favorable to the non-moving

party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean

v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh

the evidence and determine the truth of the matters asserted, 'but to determine whether there is a

genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir.

2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the

case with respect to which she has the burden, however, the moving party is entitled to summary

---

[2] The plaintiff points out that the TDA "embodies the definitions and remedies of the Tennessee Human Rights Act," but the plaintiff does not appear to assert an independent claim under the THRA. (Docket No. 47 at 7 citing *Barnes v. Goodyear*, 48 S.W. 3d 698, 705 (Tenn. 2000))

9

judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II. Disability Act Claims

As a preliminary matter, as the parties recognize, the plaintiff's ADA and TDA disability discrimination claims should be evaluated under the same standard. (Docket No. 41 at 6; Docket No. 47 at 7 both citing *Chandler v. Speciality Tires*, 134 Fed. Appx. 921, 925 (6th Cir. 2005)). That is, in the absence of direct evidence of discrimination, in order to establish a *prima facie* claim of disability discrimination, the plaintiff must show (1) that she is "disabled" within the meaning of the ADA; (2) that she was qualified to perform the requirements of the job with or without reasonable accommodation; and (3) that she suffered an adverse employment decision because of the disability. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th

10

Cir. 2008)  If the plaintiff can establish the *prima facie* case of disability discrimination (or if the plaintiff provides direct evidence of discrimination), the burden shifts back to the defendant to articulate a non-discriminatory reason for its actions, and then, if the defendant meets that burden, it is the plaintiff's burden to demonstrate that the proffered explanation is pretextual.  *Id.*

### A.    Whether Morales Was Disabled

Under the ADA, an individual is disabled if he has "(1) a physical or mental impairment that substantially limits one or more major life activities of such individual; [or] (2) a record of such an impairment; [or] (3) [been] regarded as having such an impairment."  42 U.S.C. § 12102(1).[3]  The plaintiff argues that she was disabled based on this first prong.  To qualify as disabled under this first, "substantial limits" prong, one must do more than allege a physical or mental impairment.  *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 491-92 (6th Cir. 2008).  Rather, to qualify as disabled, the physical or mental impairment must have a "substantially limit[ing]" effect on a major life activity.  *Id.*

Here, there is no question that Morales had a physical or mental impairment.  Drawing all reasonable fact inferences in favor of Morales, Morales had, and continues to have, a very painful, arthritic back condition.  Therefore, the key question is whether this condition "substantially limited" a major life activity.

---

[3] The court recognizes the "ADA Amendments Act of 2008," in which Congress, effective January 1, 2009, explicitly overruled major Supreme Court decisions construing the ADA and established that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."  P.L. 110-325 §  4(A).  The ADA amendments do not influence the court's analysis because the court is to apply the ADA law that was in place at the time the conduct complained of occurred.  *Verhoff*, 299 Fed. Appx. at 492.

11

The plaintiff claims that her impairment substantially limited several major life activities, including performing manual tasks, walking, standing, sitting, lifting, and working. (Docket No. 47 at 10-15.) The test for establishing whether an impairment substantially limits a non-work major life activity, such as walking, sitting, lifting, and performing manual tasks, is strict. *See Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997). Impairments that only "moderately or intermittently" prevent one from performing one of these activities do not substantial limit the activity; rather, the plaintiff must show that the impairment "considerably or profoundly" restricts the ability to perform the activity as compared with the general population. *Mahon v. Crowell*, 295 F.3d 585, 590-91 (6th Cir. 2002). Where the "major life activity" at issue is "working," the statutory phrase "substantially limits" requires, at a minimum, that the plaintiff show that he is unable to work in a broad class of jobs, or a broad range of jobs in various classes. *Salim v. MGM Grand Detroit LLC*, 106 Fed. Appx. 454, 459 (6th Cir. 2004). The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *Id.*

For the most part, the medical records provided to the court from this time period provide little support for the notion that the plaintiff was "substantially limited" in a major life activity by this impairment. The January and February 2007 records of Dr. Hopp indicate that he, along with the other physicians who examined the plaintiff prior to January 2007, regarded the plaintiff as having a "mild" degenerative back condition that, while painful, could be significantly aided through pain medication, therapy and an "ergonomic desk and chair" at the workplace. (Docket No. 40 Ex. 2 at 39-53.) Medical records from an April 2007 insurance coverage review concluded that "the claimant's subjective complaints are not substantiated by objective clinical

findings that would prevent her from being employed as a sales associate in a sedentary position," although this conclusion appears largely based upon an evaluation of the data available as of November 2006. (*Id.* at 53.) That said, in June 2007, in conjunction with the plaintiff's request for unemployment benefits, Dr. Hopp signed a medical certificate in which he stated that the plaintiff "*needs* ergonomic desk and chair for workplace." (Docket No. 40 Ex. 2 at 52.)(emphasis added). In sum, on the medical records alone, the plaintiff would have a difficult time raising a genuine issue of material fact as to whether her impairment substantially limited a major life activity.

The testimony of the plaintiff, however, leads to a different conclusion. At her deposition, the plaintiff testified that, in the Spring of 2007, she was in constant lower back pain that would become especially profound after sitting for any extended period of time. (*Id.* at 39-40.) The plaintiff testified that she was "in pain all the time" and that, during this time period, "there were so many things I could not do ... that isn't me." (*Id.* at 39-40) The plaintiff testified that this pain was particularly profound at work because she could not stand up occasionally to relieve her back pain (as she needed to do at her deposition); she testified, "[BST] wanted you to take calls from people constantly on the 1-800 number that they had. And, also, I was a chat specialist, so I would also do chats constantly. So I would be on the phone with two customers at one time. It was very difficult [the inability to stand, that is], let me tell you. It was very difficult, and sometimes I couldn't do it." (*Id.* at 42)

The plaintiff's deposition testimony indicates that, because the phone was constantly ringing and because she could not stand up to use the computer and talk on the phone, she was essentially "tethered" to a desk, in a sitting position, for the entire period between breaks, which

was anywhere from 75 to 150 minutes, depending on when her breaks were scheduled. (*Id.* at 44-45.) E-mails from Morales to her supervisors from this time indicate that, while Morales was occasionally able to fight through this pain and complete a full day of work, she frequently took FMLA leave because she could not bear the pain involved in sitting in one place for such an extended period of time. (*See e.g.* Docket No. 52 Ex. 3 at 11.)

While the court recognizes that there is no way to know how much pain the plaintiff was actually in during this time period, on this record, the plaintiff has raised an issue of fact as to whether she was "substantially limited" in the major life activity of sitting due to the pain she was in while she was seated. *Cf. Agnew v. Heat Treating Servs. of America*, 2005 WL 3440432, *5 (6th Cir. Dec. 14, 2005) (finding individual with bad back was not disabled, in part, because he had not alleged that his pain "endures for a significant duration of time").[4] Morales testified that, while sitting, she was in pain all of the time, and, when she could not stand up regularly, that pain became increasingly severe and unpleasant, to the point where, on many days, it was not bearable. (Docket No. 40 Ex. 1 at 39-46.) Drawing all reasonable inferences in favor of the plaintiff, the court believes that a reasonable juror could conclude that this pain "considerably and profoundly" limited the plaintiff's ability to sit as compared with the rest of the population.

Obviously, much of this conclusion is based on the plaintiff's testimony. That said, there is little to suggest that Morales was overstating her pain. The defendant failed to come forward with testimony from BST employees or acquaintances of Morales that tends to refute the fact that Morales was in intense pain that made sitting for an extended period of time very difficult.

---

[4] It is, therefore, not necessary to consider the other major life activities discussed in briefing.

Further, the record is convincing that all Morales wanted was a raised desk and chair, so that she could do her job without intense pain. That is, Morales was not trying to "game the system" for paid time off or other benefits. All indications are that Morales really could not suffer through most days at work because of the pain caused by sitting for an extended period of time.[5] Again, the court is not concluding that Morales was "disabled" as a matter of law; rather, the court is only concluding that, drawing all factual inferences in her favor, a reasonable juror could conclude that she was.[6]

## B.    Qualified with Reasonable Accommodation

Here, there is no dispute that the plaintiff was qualified to work in BST's Call Center with a raised desk and chair. Indeed, the defendant concedes that "the provision of a raised desk and a raisable chair which would allow an employee to alternate sitting and standing while performing work is a reasonable accommodation and one that would not present an undue burden. Indeed, the record in this case identifies a number of employees in plaintiff's work

---

[5] Apparently, in late April and early May 2007, the plaintiff's supervisors believed that she was abusing the FMLA leave system (taking leave when she was not ill or impaired) and sought to have her investigated for FMLA fraud. (Docket No. 53 Ex. 3 at 7.) Nothing came of this investigation, which further supports the plaintiff's claim that she was taking FMLA leave for legitimate, health reasons.

[6] Along with her summary judgment response, the plaintiff also submitted an affidavit in which she made similar statements regarding the degree of pain she was in during this period, and in which she stated that her physicians had instructed her to alternate sitting and standing throughout the day. (Docket No. 57.) In its reply brief, the defendant objected to this affidavit, stating that "[t]he court should not consider any of the after-the-fact statements made by plaintiff in her Affidavit since they were not available to the employer during the relevant time period and are not made or supported by plaintiff's health care providers." (Docket No. 58 at 2.) The plaintiff's affidavit is obviously self-serving and is rife with inappropriate legal conclusions. As is clear from the citations to the record herein, the court has not relied on the material in the plaintiff's affidavit in drawing its conclusions on the plaintiff's ADA claim.

15

group and other work groups in the building who were provided [such accommodation] ... when they established that they were entitled to receive such an accommodation." (Docket No. 41 at 13.)

Rather, in discussing this prong of the *prima facie* test, the defendant contends that the plaintiff "failed to provide sufficient medical information to establish the need for a raised desk and a raisable chair in the workplace." (*Id*.) It is not entirely clear how this argument relates to the second prong of the *prima facie* test, which only asks whether the plaintiff "was qualified to perform the requirements of the job with or without reasonable accommodation." Either way, the defendant's argument is factually inaccurate.

 The plaintiff provided ample medical information from which the defendant could have concluded that the plaintiff needed a raised desk and chair. It is undisputed that, in early January 2007, within days after she received her prescription from Dr. Hopp, the plaintiff presented her prescription (by fax and in person) for an "ergonomic desk and chair" to her supervisor (Bills), thereby making her request for a reasonable accommodation known to her employer. Bills also knew that this request meant a "raised desk and chair" because Bills, initially, worked with the plaintiff to find a location for the specialized desk and chair. Further, the plaintiff was proactive in following up on the status of her request; she stated in her deposition that, in the few weeks after she submitted her request, she called in from her FMLA leave each day and asked Bills about the status of her request. (Docket No. 40 Ex. 1 at 46-47.)

When the plaintiff returned from her disability leave on March 19, only then did Bills inform the plaintiff that the request had been denied due to insufficient medical information. (*Id*. at 47-48.) The plaintiff responded (apparently almost immediately) with additional medical

16

information, that is, her MRI, notes from her doctor and notes from her visit to her physical

therapist. (*Id.*) Therefore, the defendant's position that the plaintiff never provided sufficient

medical information is without merit, and the plaintiff has sufficiently met her burden as to the

second prong of the *prima facie* test.

### C. Adverse Employment Decision

As noted above, in order to establish a *prima facie* case of disability discrimination the

plaintiff must show that she suffered an adverse employment decision "because of" the

disability. *Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001). As discussed in the

factual section, the plaintiff was officially terminated because she did not select one of the viable

options presented to her in the May 16 letter. Indeed, rather than appealing the denial of her

disability claim, returning to work, or seeking disability benefits, the plaintiff continued, as she

had been doing for months, to simply call the FMLA administrator each day to take FMLA

leave, even though that leave had been exhausted as of May 21, 2007. (Docket No. 45 at 2;

Docket No. 44 Ex. A.) Therefore, the return-to-work date (June 5) that had been identified in the

May 16 letter came and went without the plaintiff's selecting a viable option, and she was,

therefore, terminated on the theory that she had abandoned her job. (Docket No. 40 Ex. 1 at 99.)

Indeed, the defendant contends that the plaintiff was not discharged because of any disability,

but because "she did not take advantage of one of several options offered to her." (Docket No.

41 at 15.)

Recently, the Sixth Circuit issued an opinion in a remarkably similar case that provides

the appropriate guidance here. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099

(6th Cir. 2008). In *Talley*, the plaintiff, a cashier, suffered from degenerative osteoarthritis of her

17

cervical and lumbar spine, which, along with injuries sustained in an accident, made it difficult for her to stand or sit for extended periods of time. *Id.* at 1103. The plaintiff requested that her supervisors allow her to use a stool while waiting on customers, and her supervisors repeatedly balked at the plaintiff's requests. *Id.* at 1104. One day in September 2004, the plaintiff's supervisor promised her that the plaintiff and the other principals in this dispute would sit down to resolve the issue in short order, and the plaintiff went on leave to await the meeting. *Id.* The plaintiff alleged that she tried to call the supervisors to arrange the meeting, but the meeting never took place. *Id.* Five months later, the defendant discharged the plaintiff, citing job abandonment. *Id.*

Just as here, the Sixth Circuit concluded that the plaintiff had sufficiently demonstrated that she was disabled and, apparently, that she was qualified with a reasonable accommodation, something which, as here, she was denied. *Id.* at 1105-1108. The district court had granted summary judgment for the defendant, because, facially, the plaintiff had abandoned her job as opposed to being fired; that is, the plaintiff failed to show evidence of a causal connection between an adverse employment action and the disability. *Id.* at 1104.

The Sixth Circuit reversed the district court's ruling on this final issue. Instead, the court concluded that, where a disabled employee has been denied a reasonable accommodation, the employee may have a claim under the ADA, even if there is no apparent, direct connection between the termination and the disability, under the theory of "constructive discharge." *Id.* at 1109. A constructive discharge argument is based on the theory that the employer has made the working conditions so difficult or unpleasant that it was foreseeable that a reasonable employee would abandon the position. *Id.* at 1107. As applied here,"when an employee makes a repeated

18

request for an accommodation and that request is denied and no other reasonable alterative is offered, a jury may conclude that the employee's resignation was both intended and foreseeable." *Id.* at 1109. Indeed, if an employer unreasonably denies an accommodation to a disabled employee and then waits for the employee to resign or abandon his position because work is simply intolerable without the accommodation, for purposes of the *prima facie* test, the plaintiff's resignation or abandonment should be considered a termination "because of" the disability under the theory of constructive discharge. *Id.*

In analyzing whether the application of the theory of constructive discharge is appropriate, the *Talley* court implied that district courts should examine all the circumstances, including the "interactive process" between the employer and employee *vis a vis* the proposed accommodation. *Id.* at 1110. The court noted that "we have found that the interactive process is mandatory and both parties have a duty to participate in good faith." *Id.* (internal citation and quotation omitted). Indeed, when one party obstructs the interactive process or does not participate in good faith, the court "should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.*

Like *Talley,* this is an appropriate case to apply the theory of "constructive discharge." Here, the plaintiff repeatedly pleaded with the defendant for a raised desk and chair, and, the record reflects that, after some initial interest, the defendant abandoned the effort to obtain the accommodation for the plaintiff. As noted above, Bills waited almost two months to advise the plaintiff that the plaintiff's initial accommodation request had been denied. After being so advised, the plaintiff provided additional materials to Bills for submission to Concorde, but there is no evidence Bills (or anyone else) submitted those materials.

19

Indeed, contrary to any claim that the defendant engaged in a good faith "interactive process" with the plaintiff, e-mails (discussed above in the factual discussion) demonstrate that, by late April/early May, the plaintiff's supervisors were ignoring her request for this accommodation and instead looking for a way to remove her from the payroll. The first step, after apparently not submitting the second batch of materials Morales provided to Bills, was for Sauer (and others) to speciously conclude that, because all desks and chairs at the office were, in some sense, "ergonomic," the plaintiff's request was baseless and was rightfully denied by Concorde. (Docket No. 40 Ex. 7 at 103.) Of course, as BST readily admits, Bills and the plaintiff understood that, by an "ergonomic" work station, the plaintiff and her doctor were requesting a work station with a raised desk and chair, which was an accommodation provided to at least eleven other BST employees at that center.

Further, also in May, Sauer wrote two notable e-mails to Cecilia Welch in BST's human resources department. The first stated, "I would love to get [the plaintiff] off my payroll. She is gone more than she is here for every reason in the world." (Docket No. 40 Ex. 7 at 106.) The second stated, "[she] said she is not returning until she got [sic] a raised desk ... her benefits have now been denied. ... When can I put her off payroll?" (Docket No. 40 Ex. 7 at 106.) As noted above, to this second e-mail, Welch, copying Maultsby, suggested drafting "a RTW [return to work] letter with the STD [short term disability] leave info." (Docket No. 40 Ex. 7 at 107.) Maultsby replied that she had written the letter (the May 16 letter), which, as discussed in detail above, established the return to work date of June 5. (*Id.*)

In light of *Talley* and this record, the court believes a reasonable jury could conclude that the plaintiff was constructively discharged from her position due to her disability. That is, a

reasonable jury could conclude that the defendant failed to accommodate the plaintiff's reasonable request or to suggest another reasonable accommodation, and, instead, through ignoring the plaintiff's requests for the accommodation and by concocting the explanation that the plaintiff was not entitled to any accommodation because all desks and chairs at the office were "ergonomic," the defendant forced the plaintiff into quitting or abandoning her job, which, as the Sixth Circuit concluded in *Talley*, is essentially the same thing as terminating the plaintiff.[7]

Therefore, the plaintiff has established s *prima facie* case of disability discrimination. Normally, upon establishing a *prima facie* case of disability discrimination, the burden shifts back to the defendant to articulate a non-discriminatory reason for its actions, and then, if the defendant meets that burden, it is the plaintiff's burden to demonstrate pretext.. *Talley*, 542 F.3d at 1105. However, in a constructive discharge/failure to accommodate case in which the plaintiff has established the *prima facie* case, the implicit holding of *Talley* is that, where the defendant's articulated reason is essentially that the plaintiff abandoned her job because she did not return to the non-accommodated workplace, the defendant's explanation is considered pretextual for purposes of the defendant's summary judgment motion. *Id.* at 1110. That is the precise situation here, and, therefore, the defendant is not entitled to summary judgment on the plaintiff's ADA claim (and related TDA claim).

---

[7] The defendant argues that it did suggest another reasonable accommodation, that is, an unpaid leave while the plaintiff appealed the denial of her short-term disability benefits. (Docket No. 41 at 14.) If the plaintiff had rejected a reasonable accommodation, her ADA claim would not be viable. *Talley*, 542 F.3d at 1108. Unpaid leave of an uncertain duration, however, is simply not a reasonable accommodation for a progressive back injury that causes constant pain. *Id.* (finding an alternative reasonable accommodation should allow the employee to perform his job with a similar reduction in pain).

Case 3:08-cv-00032   Document 59   Filed 05/11/09   Page 21 of 24 PageID #: 1704

## III.    Other Claims

The plaintiff also advances two other claims, one under the FMLA and the other asserting that she was subjected to a hostile work environment.  The court will consider each claim in turn, concluding that these claims are all without merit.

### A.    FMLA

The plaintiff argues that she has viable claims under the FMLA under both an "entitlement" and a "retaliation" theory. (Docket No. 47 at 24-29.)  To prevail on an entitlement claim, the employee must show, among other things, that the employer denied him FMLA benefits to which he was entitled.  *Edgar v. JAC Prods, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).  Here the plaintiff's only evidence that she had FMLA benefits that she was denied is her unsupported statement that she kept track of her FMLA leave and that, at the time she was terminated, she had "twenty to thirty FMLA hours left."  (Docket No. 47 at 25-26.)  This statement is contradicted by the detailed and comprehensive FMLA records maintained and presented by the defendant, which show that the plaintiff exceeded her allotment of FMLA hours on May 21, 2007, weeks before she was terminated.  (Docket No. 44 Ex. A.)  While the plaintiff complains that she should have been notified that she had exhausted her FMLA hours, the plaintiff has offered no authority for the proposition that an employee is entitled to FMLA relief because his employer did not notify him when he ran out of FMLA hours.  The plaintiff clearly does not have a viable claim under the FMLA based on an entitlement theory.

On retaliation, again, the plaintiff's claim is unavailing.  To prevail on a claim of FMLA retaliation, the plaintiff must show, among other things, that there is a causal connection between the protected FMLA activity and the adverse employment action, here, the termination.  *Arban v.*

*West Publishing Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). The Sixth Circuit has previously concluded that, where a plaintiff (1) has taken FMLA leave, (2) has been invited to return to work after the conclusion of that leave, and (3) fails to return to work by the specified date in the invitation and is thereafter terminated, a claim for FMLA retaliation is not sustainable because the evidence does not support a causal connection between the FMLA leave and the termination. *Killian v. Yorozu Automotive Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). That is the precise situation here, and, just as in *Killian*, the record does not support the direct connection between the FMLA leave and the termination that is required to state a claim under this provision. Therefore, the defendant is entitled to summary judgment on the plaintiff's FMLA claim.

###### B. Hostile Work Environment

Finally, the plaintiff alleges that she was subjected to a "hostile work environment." (Docket No. 19 at 2.) Whatever the proposed motive behind the allegedly hostile work environment (gender, disability, race, retaliation), to establish a claim, a plaintiff must show that her workplace was permeated with "intimidation, ridicule, and insult" sufficiently "severe and pervasive" that it altered the conditions of employment and created an "abusive working environment" both from the perspective of the victim and from the perspective of an objective observer. *Coulson v. Goodyear Tire & Rubber Co.*, 31 Fed. Appx. 851, 858 (6th Cir. 2002); *Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003).

The plaintiff's hostile work environment claim is plainly without merit. The only evidence supporting this claim is that, when she returned from short-term disability leave in March 2007, the plaintiff felt "belittled" by comments made by others in the office about the

amount of time she had taken off. (Docket No. 47 at 29.) Specifically, Sauer apparently made a comment during a meeting "in front of everyone" about the importance of being at the office and she looked directly at Morales when she made the comment. (*Id.*) Morales was apparently subjected to several of these mildly cutting comments about the need to be in the office so that everyone pulled their weight and could enjoy time off. (*Id.*) Under the standard discussed above, even assuming these comments were made, such comments simply do not make for a hostile work environment. The defendant is entitled to summary judgment on this claim as well.


## CONCLUSION

For the reasons discussed herein, the defendant's motion for summary judgment will be granted in part and denied in part. The plaintiff may move forward with her disability discrimination claim under the ADA and Tennessee Disability Act. The defendant is entitled to summary judgment on all other claims.

An appropriate order will enter.


ALETA A. TRAUGER
United States District Judge

24